THE PEOPLE OF THE STATE OF NEW YORK ex rel. GENERAL ALLIANCE CORPORATION, Relator, *v.* THE STATE TAX COMMISSION OF THE STATE OF NEW YORK and MARK GRAVES and Others, as and Constituting the STATE TAX COMMISSION OF THE STATE OF NEW YORK, Respondents.

Third Department, March 9, 1938.

414

*Hall, Cunningham, Jackson & Haywood* [*Warren W. Cunningham* of counsel], for the relator.

*John J. Bennett, Jr., Attorney-General* [*Wendell P. Brown, Assistant Attorney-General,* of counsel], for the respondents.

CRAPSER, J. The sole question presented is whether the relator was properly classified as an investment company, taxable under article 9-A of the Tax Law, or should have been classified as a holding company, taxable for 1929 under section 182 of the Tax Law and for 1930 under section 188 of the Tax Law.

The relator was organized under article 2 of the Stock Corporation Law on October 25, 1928.

The General Reinsurance Corporation, a New York corporation, organized under the Insurance Law, was engaged in the reinsurance business. In this business it is the practice for the first reinsurer to in turn reinsure the risk assumed with another reinsurer or other reinsurers. In this manner the original reinsurer accomplished the double purpose of underwriting more business and spreading its risk on all business underwritten. If the original reinsurer can reinsure with a company with which it is affiliated through financial interest and management control, the third object is accomplished, to wit, the retention of the profits of the business.

The General Reinsurance Corporation had worked out a plan of accomplishing the purpose above described with the Motor Union Insurance Company, a British corporation, and the United British Insurance Company, Ltd., another British corporation. The Motor Union owned ninety-five per cent of the ordinary shares of the United British and fifty-five per cent of the preference shares of the United British. All voting rights were in the ordinary

shares. The United British was authorized, among other things, to do the same type of reinsurance business which the General Reinsurance Corporation did. An agreement was proposed between the Motor Union and United British on the one hand, and the General Reinsurance Corporation on the other hand, which contemplated the following relationship:

1. The reinsurance by the General Reinsurance Corporation with United British of certain risks originally underwritten by the General Reinsurance Corporation:

2. The reinsurance by United British with the General Reinsurance Corporation of certain risks originally underwritten by United British;

3. The limiting of the business of United British in the United States to certain types of insurance business;

4. The definition of the insurance business which United British was to transact in other parts of the world;

5. The control by the General Reinsurance Corporation of the management of the business transacted in the United States by United British;

6. The election of nominees of the General Reinsurance Corporation to one-half of the membership of the board of directors of United British;

7. The acquisition by purchase by the General Reinsurance Corporation of one-half of all of the shares of United British held by Motor Union;

8. The agreement between the General Reinsurance Corporation and Motor Union to participate equally in the purchase of such additional shares of United British as might become available for purchase;

9. The right on the part of the General Reinsurance Corporation to acquire from Motor Union all of the shares of United British held by Motor Union, upon certain contingencies.

All of the foregoing points ultimately were provided for in two contracts, dated October 31, 1928, one between the General Reinsurance Corporation and the United British Insurance Company, Ltd., and the other between the Motor Union Insurance Company and the relator.

The General Reinsurance Corporation was permitted under its statutory powers to carry out all of the proposed agreement except points 7, 8 and 9.

The relator made an offer to the stockholders of the General Reinsurance Corporation to exchange for each share of the General Reinsurance Corporation three shares of relator's stock and a warrant evidencing the right to subscribe to one additional share

of relator's stock upon the payment of thirty dollars. All of the stockholders of the General Reinsurance Corporation accepted relator's offer and the relator thereupon received for 240,000 shares of relator's stock all of the 60,000 outstanding shares of the stock of the General Reinsurance Corporation and $1,800,000 in cash.

Of the cash so received, $801,222.98 was paid to Motor Union pursuant to the contract aforesaid for approximately forty-seven and one-half per cent of the voting ordinary shares of United British, and $541,283.80 was paid for approximately twenty-seven per cent of the non-voting preference shares of United British. $50,000 of such cash was paid for all of the capital stock of Herbert Clough, Inc., a New York corporation. There remained in the relator's treasury approximately $400,000. If and when Motor Union should acquire the remaining outstanding ordinary and preference shares of United British, thereupon the obligation of the relator to purchase one-half thereof would attach; in terms of dollars this obligation would be $422,500. Pending the maturity of this obligation the $400,000 in cash which the relator obtained as aforesaid was invested temporarily in income-producing marketable securities.

Immediately subsequent to its organization the status of the relator's capital structure, therefore, was that it owned all of the outstanding shares of the General Reinsurance Corporation, it owned all of the outstanding shares of Herbert Clough, Inc., it owned forty-seven and one-half per cent of the outstanding voting ordinary shares of United British and twenty-seven per cent of the non-voting preference shares of the latter corporation; it had miscellaneous investments to the amount of approximately $400,000, all of which would be required under its contract with the Motor Union for the purchase of additional shares of United British stock. Through the ownership of stock of United British, the relator, either directly or through its ownership of all of the stock of the General Reinsurance Corporation, and through the two said contracts of October 31, 1928, for the existence of which the stock ownership was an essential condition, controlled exclusively the management and affairs of United British within the United States and Canada, and exercised similar control jointly with Motor Union of the management and affairs of United British throughout the world.

The two contracts aforesaid were in existence throughout the period here in question and the situation with regard to the relator's capital structure remained substantially unchanged throughout the period here in question. The only changes which occurred were as follows:

1. The authorized stock of the relator was increased by 80,000 shares, all of which were issued for all of the outstanding shares of the North Star Insurance Company, a New York corporation.

2. From time to time throughout the period a few additional shares of United British were acquired under the contract.

The State Tax Commission's denial to the relator of the exemption from taxation under article 9-A was based upon the fact that the relator did not own the majority of the stock of any of the corporations in which it invested its surplus cash, to the extent of $400,000.

It was also claimed by the Commission that, although the relator owned but forty-seven and one-half per cent of all the voting stock of the United British Insurance Company, it did not control it by virtue of the agreement that it had with the Motor Union Insurance Company, which also owned forty-seven and one-half per cent of the voting stock. With this contention I cannot agree. The relator's control was as effectual through the agreement that it had as though it had owned all the controlling stock. The agreement was specific as to how the company should be managed in every particular, and the fact that the control was partly through stock ownership and partly by an agreement did not affect the relator's right to be exempted.

The relator was organized for no purpose other than to effectually carry out by agreement and by stock ownership the control of the companies whose stock it held, and it engaged in no other business.

The relator's investment of approximately $400,000 in miscellaneous marketable securities did not constitute its doing business. Upon its organization the relator had a future obligation to spend $422,500 in the purchase of additional stock of the United British, and it had obtained approximately $400,000 from the sale of its own stock at the time of its organization. This amount was temporarily invested in miscellaneous marketable securities until such time, under its contracts outstanding, as it would be needed to purchase the stock which it had contracted to purchase in order to control the companies for which it was organized. These securities were invested at a time when the market was unsettled.

The reports of the relator to the Tax Commission showed that the relator had sold holdings of its company, the preferred stock in Sterling Securities Corporation, its holding of stock in the United Corporation, and had purchased stock of the Atlantic Coast Line Railroad Company, the Chatham Phenix Allied Corporation, the Chatham Phenix National Bank and Trust Company, the Protective Indemnity Corporation and the United Biscuit Company of America, and additional shares of the Consolidated Gas Company of New

York, the National Dairy Products Corporation and the United British Insurance Company.

So far as the record shows market conditions may have been responsible for this. There is nothing in the record to indicate that these stocks were sold for the purpose of doing business, but were stocks that were held as temporary investments pending the time when the money would be required to carry out the obligations of the contract entered into.

The investment of this money did not constitute doing business under the following cases: *People ex rel. Tobacco & Allied Stocks* v. *Graves* (250 App. Div. 149); *People ex rel. Manila El. R. R. & L. Corp.* v. *Knapp* (229 N. Y. 502); *McCoach* v. *Minehill R. Co.* (228 U. S. 295); *Argonaut Consolidated Mining Co.* v. *Anderson* (52 F. [2d] 55).

During both the years here in question the relator was exempt from the payment of taxes described by article 9-A of the Tax Law on the ground that it was engaged in no business other than the holding of stocks in other corporations for the purpose of controlling the management and affairs of such other corporations.

The determination of the State Tax Commission should be reversed and annulled, with costs.

HILL, P. J., and McNAMEE, J., concur; RHODES and BLISS, JJ., dissent and vote to confirm.

Determination annulled, with fifty dollars costs and disbursements.